KEKER, VAN NEST & PETERS LLP
AJAY S. KRISHNAN - # 222476
akrishnan@keker.com
BENJAMIN BERKOWITZ - # 244441
bberkowitz@keker.com
CHRISTOPHER S. SUN - # 308945
csun@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

ACLU FOUNDATION OF NORTHERN CALIFORNIA
ALAN SCHLOSSER - # 49957
aschlosser@aclunc.org
LINDA LYE - # 215584
llye@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-1478

*Attorneys for Plaintiff San Francisco Progressive Media Center*

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE - #141930
505 Montgomery St. Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6500

*Attorneys for Plaintiffs KQED, Inc. and Los Angeles Times Communications LLC*

JEFFREY GLASSER - #252596
Los Angeles Times Communications LLC
202 West 1st Street
Los Angeles, CA 90012
Telephone: (213) 237-5000

*Attorney for Plaintiff Los Angeles Times Communications LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LOS ANGELES TIMES COMMUNICATIONS LLC, KQED, INC., SAN FRANCISCO PROGRESSIVE MEDIA CENTER,

Plaintiffs,

v.

SCOTT KERNAN, SECRETARY OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, RONALD DAVIS, WARDEN OF THE CALIFORNIA STATE PRISON AT SAN QUENTIN,

Defendants.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF [42 U.S.C. § 1983]**

**NATURE OF ACTION**

1. "To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the 'initial procedures,' which are invasive, possibly painful and may give rise to serious complications. This information is best gathered first-hand or from the media, which serves as the public's surrogate." *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 876 (9th Cir. 2002) (citation omitted).

2. This action is brought to vindicate the right of the press and the public to attend, meaningfully observe, and gather and report on important information at California executions. These executions are administered by the California Department of Corrections and Rehabilitation and the California State Prison at San Quentin. These entities are responsible for developing and implementing the protocols that govern the method for carrying out executions by lethal injection.

3. Specifically, the Defendants have constructed an execution chamber and developed a corresponding execution protocol that intentionally places critical portions of the execution beyond public observation. Pursuant to Defendants' regulations, the preparation and administration of the lethal drugs occurs in a so-called "Infusion Control Room," while the inmate is located in the separate "Lethal Injection Room." Pursuant to Defendants' regulations, the public has an opportunity to view the activities in the Lethal Injection Room, but is denied any opportunity to view the activities in the Infusion Control Room. In addition, pursuant to Defendants' regulations, the curtain to the viewing windows on the Lethal Injection Room is to be closed and the public address system turned off, if the inmate does not die after administration of three doses of the lethal injection chemical. The public is thereby prevented from observing Defendants' response when the execution does not proceed as intended. This Federal Court has enjoined the Defendants—and their predecessors in the California government—from engaging in similar efforts to conceal portions of the execution process. It should do the same here.

4. The First Amendment of the United States Constitution guarantees the right at issue. Members of the press effectuate the right by attending executions and serving as surrogates

for the public at large. Plaintiffs, media organizations that report on California executions, seek injunctive relief to prevent the Defendants from executing any death row inmates in a manner that conceals important information to which the public is constitutionally entitled. Specifically, the public is constitutionally entitled to observe the processes and procedures by which the State puts an inmate to death.

5. Plaintiffs bring this action to vindicate the public's right of access to executions, and to prevent the State of California from carrying out significant portions of executions behind closed doors. Plaintiffs have a right to observe the preparation and administration of lethal drugs, but Defendants have arbitrarily chosen to locate these critical portions of the execution process in the Infusion Control Room. Plaintiffs also have a right to observe the provision of "medical assistance" to an inmate if administration of the lethal injection chemical does not cause death, but Defendants have arbitrarily chosen to block visual and aural observation of this critical portion of the execution process in the Lethal Injection Room. The First Amendment right of access enables the press and the public to obtain essential categories of information, including, but not limited to, information about how the lethal injection chemical is prepared and administered, if execution staff properly prepared or administered the chemical, the number of doses used in the execution, how the prisoner reacted to each dose, how effectively and professionally the execution staff performed, and how effectively and professionally the execution staff perform if the execution does not proceed as intended. In contrast to other methods of executions, executions by lethal injection involve more numerous and more complex steps and procedures—resulting in much greater room for error. As a result, the press and the public have an even greater interest in observing each step in the process than with other methods of executions that have historically been open to public observation but that are carried out with a less elaborate set of procedures and discretion.

6. This lawsuit is not a challenge to the death penalty or to all lethal-injection executions. Rather, Plaintiffs contend that California must not execute death row inmates in a manner that violates the First Amendment rights of the press and of the public. The public requires information to make informed decisions, via democratic processes, about whether

executions should be conducted at all, and if so, how. This First Amendment claim, therefore, vindicates the public's right of access to information related to that democratic decision-making process.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violations), § 2201 (declaratory relief), and § 2202 (further relief). This action arises under the First Amendment to the United States Constitution and under 42 U.S.C. § 1983.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b) because the California State Prison at San Quentin in San Quentin, California, is located in this District. All executions conducted by the State of California ("State") occur at San Quentin, which is located in Marin County. The events giving rise to this complaint will occur in this District.

9. Pursuant to Local Rule 3-2(c) and (d), assignment to the San Francisco Division is proper because a substantial portion of the events giving rise to this action occurred and will occur in Marin County.

**THE PARTIES**

10. Plaintiff Los Angeles Times Communications LLC ("LA Times") covers U.S. and international news. First published in 1881, the LA Times has a daily readership of 1.4 million and Sunday readership of 2.4 million through latimes.com and the newspaper. The LA Times, which has won 44 Pulitzer Prizes, regularly covers criminal proceedings involving defendants who have been sentenced to death and has been actively involved in covering death penalty issues. It has previously sent reporters to witness and report on executions in California, including the executions of Robert Alton Harris, Stephen Wayne Anderson, and Robert Lee Massie. The LA Times also intends to send reporters to witness and report on future executions in California. Witnessing the entirety of an execution is crucial to the LA Times' ability to accurately report on and provide its readers with a full and complete description of the lethal injection process as carried out in California.

11. Plaintiff KQED, Inc. ("KQED") is a non-profit media organization founded in 1953 that operates public television and radio stations. The television and radio stations operated

by KQED produce some of the most-watched and most-listened-to television and radio programs in the country. These stations produce news programs that regularly report on, among other things, the application of the death penalty in California. KQED has previously sent reporters to witness and report on executions in California, including the executions of William Bonin and Daniel Williams. KQED intends to send reporters from its television and radio news programs to witness and report on future executions in California. Witnessing the entirety of an execution is crucial to KQED's ability to accurately report on and provide its audience with a full and complete description of the lethal injection process as carried out in California. KQED has previously challenged abridgments of the media's right to access correctional facilities. *See Houchins v. KQED, Inc*., 438 U.S. 1 (1978).

12. Plaintiff San Francisco Progressive Media Center is a non-profit founded in 2013 that publishes the website 48hills.com. Stories published on 48hills.com include feature-length commentary, news analysis, and investigative reporting. The founder of the San Francisco Progressive Media Center is Tim Redmond, the former executive editor of the San Francisco Bay Guardian. While at the Bay Guardian, Mr. Redmond sent a reporter to witness and report on an execution conducted in San Quentin. The San Francisco Progressive Media Center intends to continue reporting on what eyewitnesses to California executions observe during an execution by lethal injection and intends to send reporters to witness and report on future executions in California. Witnessing the entirety of an execution is crucial to the San Francisco Progressive Media Center's ability to accurately report on and provide its readers with a full and complete description of the lethal injection process as carried out in California.

13. Defendant Scott Kernan is the Secretary of the California Department of Corrections and Rehabilitation ("the Department"). Kernan, or those under the control of the Secretary of the Department, developed the regulations setting forth California's execution protocol and is responsible for implementing it.

14. Defendant Ronald Davis is the Warden of the California State Prison at San Quentin ("San Quentin Prison"). California death row inmates are incarcerated and executed at San Quentin Prison. Davis, or those under the control of the Warden of San Quentin Prison,

developed the regulations setting forth California's execution protocol, and is responsible for implementing it.

**ALLEGATIONS IN SUPPORT OF DECLARATORY AND INJUNCTIVE RELIEF**

15. In response to concerns raised by the United States District Court for the Northern District of California in *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006), about deficient conditions at the execution facilities at San Quentin Prison, the office of then-Governor Arnold Schwarzenegger began construction of a new lethal injection facility in 2007. Despite the new construction costing approximately $853,000, no one from Governor Schwarzenegger's office sought approval from the California Legislature for the project.

16. Construction of the new lethal injection facility was completed in 2008. The facility includes a central death chamber ("Lethal Injection Room") where an inmate is strapped to a gurney and ultimately executed. Surrounding the Lethal Injection Room are three separate rooms where witnesses can view the execution. A fourth room where prison officials prepare and administer the lethal injection chemical (the "Infusion Control Room") is also located directly adjacent to the Lethal Injection Room, but provides witnesses no viewing access. This execution chamber was therefore constructed with a layout that conceals the activities inside the Infusion Control Room from the press and the public.

17. Under California law, death sentences shall be carried out by "administration of a lethal gas or by an intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections and Rehabilitation." Cal. Penal Code § 3604(a). The statute prescribes no specific drugs, dosages, drug combinations, or manner of intravenous line access to be used in the execution process; nor does the statute prescribe any certification, training, or licensure required of those who participate in the execution process. By statute, the Department must determine all of these aspects of the execution process using lethal injection.

18. Title 15 of the California Code of Regulations § 3349, *et seq*. (the "Lethal Injection Regulations") sets forth the lethal injection protocol adopted by the Department. The Lethal Injection Regulations that went into effect on March 1, 2018 are the latest version of

California's lethal injection procedure—formerly known as San Quentin Operational Procedure No. 770 ("Procedure 770")—which has evolved since it was first adopted in the mid-1990's. A copy of the current procedure is appended to this Complaint as Exhibit A.

19. On January 29, 2018 the Department adopted new revisions to the Lethal Injection Regulations. A central feature of the change enacted by these revisions is a reduction in the number of different drugs used to carry out an execution by lethal injection. Prior to the adoption of the most recent revisions to the Lethal Injection Regulations, executions were carried out via injections of a lethal combination of three chemical substances, in the following order: first, sodium pentothal, a short-acting barbiturate; second, pancuronium bromide, which paralyzes all voluntary muscles; and third, potassium chloride, which causes cardiac arrest.

20. Under the current iteration of the Lethal Injection Regulations, executions are carried out by injecting a single chemical selected from among two choices: pentobarbital or thiopental. Cal. Code Regs. tit. 15, § 3349.5(f)(2)(C). The Warden of San Quentin selects the chemical to be used in any given execution on a case-by-case basis, taking into account different factors like the availability of each chemical. Cal. Code Regs. tit. 15, § 3349.5(f)(2)(A). Nothing in the Lethal Injection Regulations requires the Warden to inform the public of whether an execution will proceed using pentobarbital or thiopental. The FDA-approved manufacturers of pentobarbital have prohibited their use in executions. Thiopental is not available domestically and cannot lawfully be imported into the country.

21. At all times, the activities inside the Infusion Control Room are not visible to witnesses attending the execution. These activities are concealed from the public and the press.

22. A witness in the Infusion Control Room would be able to discern if an execution is proceeding with pentobarbital or thiopental. During the execution, if the selected lethal injection chemical is pentobarbital, it is administered by a dose consisting of 7.5 grams and delivered by means of three syringes, each containing 2.5 grams of the chemical. Cal. Code Regs., tit. 15, § 3349.6(g)(4)(A). If the selected lethal injection chemical is thiopental, it is administered by a dose consisting of 7.5 grams and delivered by means of five syringes, each containing 1.5 grams

of the chemical. Cal. Code Regs., tit. 15, § 3349.6(g)(4)(B). The drugs are administered from the Infusion Control Room, regardless of which is selected.

23. "Approximately three hours prior to the initial scheduled execution date and time," a team of prison officials prepares three doses of the lethal injection chemical (for a total of 9 syringes for pentobarbital and 15 syringes for thiopental) in the Infusion Control Room. Cal. Code Regs. tit. 15, § 3349.6(g)(4)(C).

24. "[T]wo hours prior to the initial scheduled execution date and time," witnesses are escorted into designated witness rooms where they have a view of the Lethal Injection Room and can listen to activities in the Lethal Injection Room through a public address system. Cal. Code Regs. tit. 15, § 3349.6(h), § 3349.7(b)(4). Again, witnesses cannot see into the Infusion Control Room.

25. "Approximately 15 minutes before an initial scheduled execution date and time," the inmate is escorted into the Lethal Injection Room. Cal. Code Regs. tit. 15, § 3349.6(k)(1). After the inmate is escorted into the Lethal Injection Room and secured to a gurney, a first set of prison officials attaches intravenous lines to the inmate. Cal. Code Regs. tit. 15, § 3349.7(a)(3). These lines extend to the Infusion Control Room. The Infusion Control Room is where a second set of prison officials administers doses of the lethal injection drug directly into the intravenous lines. Cal. Code Regs. tit. 15, § 3349.7(b)(5).

26. Infusion begins after "a statement detailing the court order mandating the execution is read aloud" and prison staff provide "an opportunity for the inmate to make a brief final statement" on the public address system. Cal. Code Regs. tit. 15, § 3349.7(b). The Lethal Injection Regulations address the contingency that death might not result from administration of a single 7.5 gram dose. If the first 7.5 gram dose of the drug has been administered and the inmate is still alive, prison officials in the Infusion Control Room administer up to two additional doses of the chemical. Cal. Code Regs. tit. 15, § 3349.7(c). Efforts to execute the inmate continue until up to three doses have been administered; efforts to execute the inmate cease only upon the inmate's death or ten minutes following the administration of a third dose, whichever occurs first. Cal. Code Regs., tit. 15, § 3349.7(c)(12).

27. If the inmate has not died after administration of the third dose, the protocol calls for the Warden to "stop the execution," and "summon medical assistance" for the inmate. Cal. Code Regs. tit. 15, § 3349.7(c)(12), § 3349.7(d). At this juncture, the curtains on the viewing windows to the Lethal Injection Room are closed, the public address system is turned off, and witnesses are escorted away from the Lethal Injection Facility. Cal. Code Regs. tit. 15, § 3349.7(d). The protocol does allow witnesses to view efforts to provide "medical assistance."

28. A limited number of members of the public are permitted to witness executions in California. The continued right of the public to witness executions in California is codified in California Penal Code § 3605, which provides that "at least 12 reputable citizens" must be invited to be present at the execution.

29. Journalists routinely serve as witnesses at executions and, in that capacity, proxies for the general public. These eyewitnesses serve as surrogates for those members of the press and the public who are not able to attend executions personally. Members of the press have, in the past, regularly served as eyewitnesses to executions in California and have reported on their observations. Those journalists selected to witness an execution shared, as a matter of practice and as required by former Procedure 770, what they saw with other journalists that were not selected to attend. These observations were shared freely and regardless of affiliation. As a result, information about an inmate's execution was disseminated to a variety of news outlets. By serving as surrogates to the public in this manner, members of the press and other witnesses to an execution effectuate the First Amendment rights of the public and the press to attend and meaningfully observe executions.

30. Public access to such information about the manner by which convicted criminals are put to death enhances the proper functioning of the execution process and promotes public confidence in the integrity of the criminal justice system. An informed public debate is critical in determining whether execution by lethal injection comports with "the evolving standards of decency which mark the progress of a maturing society." *Cal. First Amendment Coal.*, 299 F.3d at 876. "To determine whether lethal injection executions are fairly and humanely administered, or whether they ever can be, citizens must have reliable information about the 'initial procedures,'

which are invasive, possibly painful and may give rise to serious complications." *Id.* The disclosure of relevant information about execution procedures reduces the risk that improper, ineffective, or defectively prepared drugs are used and promotes the proper functioning of the execution process.

31. The issue of whether California's lethal injection protocol functions properly has received substantial media attention in California and nationwide, and is of great interest to the public. Defendants did not provide the public with an opportunity to comment on the current regulations. But when the Department was drafting the predecessor to the current regulations, it received approximately 168,000 comments from approximately 35,000 organizations and members of the public, which demonstrates the intensity of the public's interest in executions by lethal injection.

32. Members of the press and the public who witness executions at San Quentin are unable to observe and report on significant aspects of the execution process. Specifically, witnesses are unable to view or otherwise observe any procedures that occur in the Infusion Control Room, including the preparation of the lethal injection drugs and the administration of doses of those drugs during the execution process.

33. An important consideration in determining whether or not the public has a First Amendment right of access to governmental proceedings is whether those proceedings have historically been open to the press and general public. Historically, executions—and information concerning how executions are conducted and the preparation of the instrumentalities of an execution—have been open to the public. As the United States Court of Appeals for the Ninth Circuit has noted, "[h]istorically . . . . [e]xecutions were fully open events in the United States." *Cal. First Amendment Coal.*, 299 F.3d at 875. "With historical executions, the actual means of execution was open and obvious to the public: rope, sodium cyanide gas, and electricity. The public could not only view the prisoner's death, they could see the precise cause and its effects. The public and the press therefore historically were allowed to see the specific means used to execute the prisoner." *Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *5 (D. Ariz. Oct. 7, 2013).

34. Hangings, for example, were conducted using scaffolds that were specifically constructed to accommodate large crowds. *See* Stuart Banner, *The Death Penalty, An American History* 10-11 (2002). The citizens who attended and witnessed such executions often numbered in the thousands. *See* Deborah Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death over the Century*, 35 Wm. & Mary L. Rev. 551, 564 (1994). The public also had access to detailed information about the size, quality, and production of the rope used in hangings. *See, e.g.*, *The Ropes Made, A peculiar mark of identification upon each*, Cincinnati Enquirer (Mar. 16, 1897) at 12*; Hanged, Jackson and Walling Jerked Into Eternity*, Spokane Daily Chron. (Mar. 20, 1897) at 1.

35. The procedures barring witnesses from observing (1) the process of preparing and administering the lethal injection chemical and (2) efforts to provide "medical assistance" to an inmate in the event administration of the lethal injection chemical does not result in death serve no legitimate functional or penological purpose in the lethal injection protocol. Even if a legitimate penological purpose existed, the damage done to the First Amendment interests by concealing that information would outweigh the penological purpose. Keeping secret the activities that occur in the Infusion Control Room and, in some instances, in the Lethal Injection Room serves no purpose other than suppressing important information about the execution process from the public and the press. Defendants know that the only function of preventing witnesses from seeing these procedures is to conceal information, but they continue to do so despite this knowledge.

36. Defendants prepare and administer the lethal injection chemical in the Infusion Control Room, and provide "medical assistance" to an inmate in the Lethal Injection Room, beyond the observation of witnesses, in a manner that conceals important information from the press and the public. In the past, Defendants and their predecessors incorporated into the lethal injection process procedures intentionally aimed at suppressing important information from those observing the execution. Specifically, in *California First Amendment Coalition*, 299 F.3d at 880, the plaintiff media organization challenged the San Quentin Prison and Department policy of drawing a physical curtain in front of the lethal injection chamber while prison guards strapped

down the inmate and inserted intravenous lines into his arms. On the basis of an internal Department of Corrections memo, the district court found and the Ninth Circuit affirmed that "Procedure 770 was motivated, at least in part, by a concern that the strapping of a condemned inmate, the injection of intravenous lines or other aspects of a lethal injection execution would be perceived as brutal by the public and thus was, to that extent, prompted by considerations other than legitimate concerns for prison personnel safety." *Cal. First Amendment Coal.*, 299 F.3d at 880. Similarly, here, Defendants' concealment of the preparation and administration of the lethal injection chemical serves no legitimate purpose and instead prevents the public from learning this information.

37. Observation of the preparation and administration of the lethal injection chemical would allow witnesses to determine important issues, including but not limited to which drug (thiopental or pentobarbital) Defendants are using in the execution and whether the execution team is following protocols to avoid foreseeable errors in the execution process that could cause pain to the inmate. Observing efforts to provide the inmate with "medical assistance" in the event administration of the lethal injection chemical does not cause death would allow witnesses to determine the nature of the execution team's response when the execution does not proceed as intended, and the impact of errors in the execution process on the inmate. Executions by lethal injection follow many complex steps, requiring skill and training. Missteps by the execution team, whether for lack of training, skill, competence, or other reasons, can cause prolonged and/or painful procedures. The public and press have an interest in understanding whether Defendants are conducting executions with a drug that is not lawfully available in this country, and the extent to which actions or omissions of the execution team caused ultimate errors in an execution, as well as the effect of those errors on the inmate. Because executions by lethal injection involve procedures that are more numerous and more complex than other methods of execution, the press and the public have an even greater interest in witnessing the process than with other methods of executions that have historically been open to public observation but that are carried out with a less elaborate set of procedures and discretion.

38. Defendants' concealment of the preparation and administration of the chemical used in lethal injection procedures and the provision of any "medical assistance" to an inmate necessarily impacts Plaintiffs' First Amendment rights. The sequestration of those processes behind the walls of the Infusion Control Room prevents the press and the public from obtaining essential categories of information, including information about what lethal injection chemical was used, how the lethal injection chemical is prepared, how it is administered, if it was prepared or administered properly, the number of doses administered, the prisoner's reaction to each dose, the training and professionalism of the execution staff, and still other information that society values. The press and the public are entitled to each of these types of information, all of which the Lethal Injection Regulations conceal. Additionally, Defendants' infringement of Plaintiffs' First Amendment rights is *per se* improper because Defendants acted with the purpose of concealing these portions of executions from the press and public. Defendants have presented no cognizable interest justifying the exclusion of witnesses from observing these procedures. This conduct constitutes a *per se* violation of Plaintiffs' First Amendment rights to meaningfully witness and obtain information at executions.

39. As independent witnesses to execution proceedings, members of the news media and other witnesses to executions provide public scrutiny, which enhances the integrity of the death penalty process and aids the public in its evaluation of whether executions are fairly and humanely administered. Reporting by members of the press that are not associated with the condemned, the victim, or the State of California is critical to assuring the public that they have thorough and objective facts about the execution process, particularly in the immediate aftermath of an execution, when public interest in and debate about the death penalty is at its peak.

40. The Lethal Injection Regulations result in irreparable injury to Plaintiffs because the information suppressed and concealed by the protocol can never be reacquired.

41. This complete and permanent loss of socially valuable information to the press and to the public cannot be redressed by legal remedies.

42. Defendants' prior intentional attempts to conceal information about the execution process from the press and the public weigh in favor of injunctive relief.

43. An actual controversy exists between Plaintiffs and Defendants as to whether the Lethal Injection Regulations violate Plaintiffs' First Amendment rights.

**CLAIM FOR RELIEF**

**FIRST AMENDMENT RIGHT OF ACCESS TO PUBLIC PROCEEDINGS**

**(FIRST AMENDMENT AND 42 U.S.C. § 1983)**

44. Plaintiffs hereby reallege and incorporate by reference the paragraphs above as though fully set forth herein.

45. Defendants' Lethal Injection Facility and Lethal Injection Regulations intentionally shield from public observation the activities in the Infusion Control Room and the provision of medical assistance to the inmate in the Lethal Injection Room. These actions prevent Plaintiffs and the public from viewing and listening to critical aspects of the execution process, including critical procedures that are inextricably intertwined with the execution process.

46. Defendants prevent Plaintiffs from observing the preparation of the lethal drugs, their administration, the effects of the lethal drugs on the inmate being executed, and the provision of "medical assistance" to the inmate in the event administration of the lethal injection chemical does not result in death.

47. The First Amendment provides the press and the public the right to observe executions and procedures inextricably intertwined with the execution process. Defendants cannot justify shielding from public observation the preparation and administration of the lethal injection chemical, or the provision of medical assistance to the inmate in the event administration of the lethal injection chemical does not result in death.

48. Defendants are acting under color of state law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

1. A declaration of the First Amendment rights of Plaintiffs;

2. Injunctive relief to enjoin the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from employing an execution procedure

that conceals important information to which Plaintiffs and the public are entitled under the First Amendment;

3. Reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

4. Costs of suit; and

5. Any such other relief as the Court deems just and proper.

Dated: April 11, 2018

KEKER, VAN NEST & PETERS LLP[1]

By: /s/ *Ajay S. Krishnan*
AJAY S. KRISHNAN
BENJAMIN BERKOWITZ
CHRISTOPHER S SUN

Attorneys for Plaintiff San Francisco Progressive Media Center

ACLU FOUNDATION OF NORTHERN CALIFORNIA

By: /s/ *Linda Lye*
ALAN SCHLOSSER
LINDA LYE

Attorneys for Plaintiff San Francisco Progressive Media Center

DAVIS WRIGHT TREMAINE LLP

By: /s/ *Thomas R. Burke*
THOMAS R. BURKE

Attorneys for Plaintiffs KQED, Inc. and Los Angeles Times Communications LLC

[1] The undersigned hereby attests that he has obtained concurrence in the filing of this e-filed document from the other signatories to this document.